THERESA R. LORENCEN,
     Plaintiff,

CIVIL NO. 2:07-CV-14589

DISTRICT JUDGE LAWRENCE P. ZATKOFF
vs.                                  MAGISTRATE JUDGE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,
     Defendant,
_____/

## REPORT AND RECOMMENDATION

### I.    BACKGROUND

Theresa R. Lorencen brought this action under 42 U.S.C. §405(g) and § 1383(C)(3) to challenge a final decision of the Commissioner denying her application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Both parties have filed motions for Summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

### A.    PROCEDURAL HISTORY

Plaintiff filed concurrent applications for DIB and SSI on November 10, 2004, alleging an onset of disability on April 22, 2004 (R. 277). She has fully insured status for DIB through June 30, 2010 (R.53). Plaintiff's claim was initially denied (R. 33, 35), and Administrative Law Judge Dennis M. Matulewicz ("ALJ") held a hearing on September 11, 2006, at which Plaintiff was represented by her current attorney (R. 300). In a December 23, 2006, decision, ALJ

Matulewicz concluded that Plaintiff was not under a disability as defined by the Social Security Act because Plaintiff retained the capacity for work that exists in significant numbers in the national economy (R. 591-604). Plaintiff filed a request for a review which the Appeals Council denied on September 28, 2007 (R. 5-7).

**B.   BACKGROUND FACTS**

Plaintiff, born August 29, 1960, is 5'6" tall, weighs 149 pounds. She was 46 years old at the time of her hearing (R. 26, 302, 313). Plaintiff graduated from high school and has no additional education or training (Dkt. #1, p. 2; R. 306).

**1.   *Plaintiff's Testimony and Statements***

**a.   Plaintiff's Work History**

Plaintiff worked for Metaldyne Industries in Litchfield, Michigan, from August 1993 until January 2005 as a Grinder and Press Operator (R. 276). Prior to that she worked for Temporary Services under the same title from July 1992 until starting at Metaldyne. Between June 1991 and July 1992, Plaintiff worked for Aeroquip in Jackson in the shipping and receiving department until she was laid off. Plaintiff was also laid off from Mechanical Products in Jackson in June 1991 where she had worked as a Grinder Operator and Assembly of circuit breakers since July 1990.

**b.   Plaintiff's Physical Medical History**

Plaintiff was injured at work on April 22, 2004, when a 60 pound press fell on her left hand cutting it to the base of the middle finger (R. 19, 167). An x-ray demonstrated a longitudinal fracture of the proximal phalanx. The wound was cleaned and splinted. Vicodin was prescribed for pain and the antibiotic Keflex.

Plaintiff was referred to the orthopedist Richard J. Hartman, Jr., D.O., by the emergency room on April 23, 2004 (R. 188). At the initial evaluation, Plaintiff told Dr. Hartman that the "Vicodin helps somewhat." On April 30, 2004, an x-ray confirmed the fracture in her middle finger (R. 187). On June 18, 2004, Dr. Hartman noted that the range of motion and strength were as expected (R. 182). Yet, he also diagnosed a possible reflex sympathetic dystrophy syndrome ("RSDS").[1] Plaintiff requested a second opinion from David Gerstner, M.D., who had treated her for a previous injury to her left elbow (R. 19, 182). Dr. Hartman also suggested physical therapy and continued her work restrictions (R. 182).

Dr. Gerstner evaluated Plaintiff on June 28, 2004, noting some mild swelling in the left hand compared to the right (R. 233-35). Plaintiff reported that her middle, ring and small fingers had been in a cast for approximately 9 weeks which was removed 10 days earlier (R. 233). She reported aching in the hand and color changes in her fingers. Dr. Gerstner observed good color and capillary refill throughout the fingers and a reasonable wrist range of motion without obvious problems. He noted that she had limitation of motion of her long, ring, and small fingers that she held in extension. The index finger and thumb had good range of motion. Dr. Gernster did not detect any local tenderness with palpation over the fracture or any of the fingers

---

[1]Social Security Ruling ("SSR") 03–02p defines RSDS as follows: RSDS is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger RSDS. The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. When left untreated, the signs and symptoms of the disorder may worsen over time. *See* SSR 03-02p, "Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome" (found at: http://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR2003-02-di-01.html) (last visited 3/20/08).

and finger alignment was good.  He noted that she may have digital nerve injury to the long and ring fingers.  Dr. Gernster believed that the cause of finger stiffness was probably a combination of the injury and prolonged immobilization.  He recommended physical therapy with surgical exploration to be considered if the numbness persisted (R. 233-34).  Dr. Gernster stated that the mild swelling and color changes should improve as she remobilized her fingers (R. 234).

Plaintiff participated in physical therapy in June 2004 through September 2004 (R. 152-65).  Nancy Charlier, O.T.R., noted in the discharge summary that Plaintiff was inconsistent in attending her appointments (R. 152).  Plaintiff reported to Ms. Charlier that she had independence with all activities of daily living, and she continued to drive, but was limited to using her right hand at work (R. 154).  Plaintiff was discharged due to "no progress noted over that past months of treatment" (R. 152).

 On July 1, 2004, Plaintiff complained that her hand was "still pretty sore" (R. 181).  Dr. Hartman recommended a consultation with a specialist, Dr. Shoregi, to determine if she had RSDS.  On August 3, 2004, Plaintiff was examined by a physician's assistant who again suggested a consultation with Dr. Shoregi (R. 180).  Plaintiff declined instead asking for a referral to David L. Gerstner, M.D.  The physician's assistant continued her work restrictions and Vicodin prescription.  Plaintiff returned to Dr. Hartman on March 1, 2005, for review of the possible diagnosis of RSDS (R. 179).   Plaintiff reported that the pain had radiated to her left elbow and shoulder.  Dr. Hartman noted that the RSDS may be spreading to her left upper extremity and said that he could not help her at this time.  He recommended that she be treated by a physician who treats RSDS.  He referred her back to Thomas Lazoff, M.D.

Plaintiff was initially examined by Dr. Lazoff on August 24, 2004, for her worker's compensation claim (R. 139-145).  Plaintiff reported pain in her left middle and ring finger with

numbness and tingling in the digits (R. 139). She reported pain of an 8 on a scale of 10 stating that the pain was "pretty constant." Dr. Lazoff diagnosed her with fracture of the left middle finger with a probable component of complex regional pain syndrome ("CRPS")[2] sympathetically mediated (R. 140). He noted atrophy in the left hand, which could be due to disuse or focal nerve compression, and he ordered an electrodiagnostic ("EMG") study of her left upper extremity, and placed her on a 16-day Medrol Dosepak (R. 141). He also prescribed Neurontin and continued her activity restrictions of no use of the left arm, no repetitive use of the left arm, and no firm gripping with the left hand.

Plaintiff returned to Dr. Lazoff on September 16, 2004, for an EMG reporting "success with therapy" and that she was "doing a home exercise program" (R. 132). She stated that the Medrol Dosepak helped, but she still complained of "some burning discomfort on the dorsum of her left hand." She informed Dr. Lazoff that she had not taken the Neurontin because "another physician had started her on this awhile back and she became ill." Dr. Lazoff noted that her hand did not appear as shiny and that range of motion had improved, but was still not normal. EMG results were normal with no evidence of focal ulnar or median neuropathy, nor radiculopathy or plexopathy in the left upper extremity. Dr. Lazoff stated that the slight atrophy was due more to disuse than any nerve involvement. He further observed that she appeared to have a component of a CRPS, but it had improved (R. 133).

Dr. Lazoff told Plaintiff that she had a very mild form of CRPS at best and that she was "doing well overall." He anticipated releasing her to work in four weeks and recommended occupational therapy two or three times a week until then. Dr. Lazoff prescribed a low-dose of

_____

[2]*See id.* (CRPS and RSDS "are synonymous").

Desipramine for the neuropathic discomfort, but did not see a need for sympathetic blocks or any more aggressive treatment.

Plaintiff saw Dr. Lazoff on October 14, 2004, with "no improvement in her overall symptomatology" (R. 127). Plaintiff was "somewhat angry" because she had read his treatment notes regarding his opinion that she had a mild form of CRPS and was improving. Plaintiff reported that she had not taken the Desipramine as prescribed. Dr. Lazoff examined Plaintiff and observed some swelling of her ring, middle, and index finger. Dr. Lazoff mentioned that he had reviewed the physical therapy notes and that Plaintiff's attendance had been inconsistent. The therapist documented normal range of motion at the last visit, but on examination she did not have "full flexion of the proximal interphalangeal joints or distal interphalangeal joints, although it is close to normal" (R. 127). Dr. Lazoff's diagnosed her with CRPS, sympathetically mediated, left hand and wrist. He recommended a cervical sympathetic block the left and continued the same work recommendations (R. 128).

Plaintiff was examined by plastic surgeon, John Sampson, M.D., on November 29, 2004, who noted that the fingers on Plaintiff's left hand were cool and pale compared to the right hand (R. 172-78). He found a full range of motion with no clear limitations of movement except for the third digit and the fact that she could not make a complete fist with her left hand. Dr. Sampson believed that "there is a significant possibility that she does have Reflex Sympathetic Dystrophy" (R. 172). Plaintiff told him that she was going to be evaluated by a physician in Grand Rapids at the request of her insurance company.

In a letter to Dr. Israel, Dr. Sampson had two recommendations: 1) that Plaintiff choose a single physician responsible for her care, as she seemed to be going from doctor to doctor partly due to the insurance and as a result she lacks a clear definition of who her physician is; and 2)

that Plaintiff have a course of physical therapy with anti-inflammatory medication.  If the pain medications were not successful over a 4-6 week period, he recommended that she be sent to a pain clinic.  Dr. Sampson also expressed concern that RSDS had been diagnosed "so quickly" and that in his opinion it should have been a diagnosis of exclusion, not the first diagnosis (R. 172).   His office notes state "She does have coolness to her hands with persistent pain and fortunately this pain is not disabling" (R. 173).

Plaintiff's primary care physician, Robert Israel, M.D., diagnosed her with RSDS (R. 121, 124-25).   Plaintiff reported symptoms of burning, color change, sweating, and pain, particularly in the 3rd, 4th, and 5th fingers of her left hand (R. 125).  Dr. Israel examined Plaintiff approximately every month through 2006 (R. 207-18).

His August 25, 2004, letter stated that Plaintiff had symptoms which were consistent with RSDS, including burning pain, color changes, and thin skin (R. 125).  In his September 21, 2004, treatment notes, Dr. Israel noted that Plaintiff was attending physical therapy and was almost able to flex her fingers to a normal grip (R. 123).  Dr. Israel issued a subsequent note dated October 13, 2004, stating that Plaintiff has RSDS in her left arm, and  recommended that she be restricted from any use of her left arm because repetitive use could aggravate her RSDS (R. 121).

Plaintiff reported burning and pain in her right hand and arm to Dr. Israel in November 2004 (R. 218).  He observed a tender medial epicondyle, but good range of motion.  Dr. Israel diagnosed her with tendinitis and prescribed Motrin, 800 mg, and a tennis elbow strap.   In December 2004, Plaintiff reported that her right elbow was 50% better (R. 217).  Plaintiff continued to report left and right arm pain in 2005 and 2006 (R. 208-16).  On July 19, 2005, Plaintiff reported that the pain in her left arm was better with Vicodin (R. 215).

By January 2006 the arm pain was mostly controlled with Vicodin (R. 210).  On February 3, 2006, Dr.  Israel replaced the Vicodin with Lorcet because Plaintiff reported that the Vicodin did not always "kick in" (R. 208).  Dr. Israel found her to have a good grip and no sensory loss of her right hand on February 23, 2006 (R. 207).

The record also includes a September 8, 2006, affidavit from Plaintiff's mother, Minnie Lorencen, regarding Plaintiff's pain from her left hand injury (R. 119-20).  Ms. Lorencen's affidavit stated that Plaintiff has been in a lot of pain since the injury and her daughter assists her with some household chores, and is irritable due to the pain.

### c.        Plaintiff's Mental Health History

Plaintiff also alleged disability due to depression (R. 22).  While Dr. Israel prescribed her Effexor, an antidepressant,  there is no other evidence of counseling or therapy to treat depression (R. 126).  In February 2004, Plaintiff reported to Dr. Israel that her mood was better and she was thinking more clearly.  She noted that she was "not jumping on her daughter as much" and was not crying.  In December 2004, Plaintiff was still taking Effexor and reported that her mind was clear and calm (R. 217).  Dr. Israel continued to prescribe Effexor with continued reports of a clear mind (R. 212-16).  On November 21, 2005, Dr. Israel found that Plaintiff's affect was good  and she reported that she was more clear-headed (R. 212).  Dr.  Israel continued to prescribe Effexor in 2006, but there are no other comments on Plaintiff's symptoms of depression in his treatment notes (R. 207, 209, 224-26).

### d.        Residual Functional Capacity Assessments

Dr. Hartman also completed a physical capacities assessment for the Michigan Rehabilitation Services on March 5, 2005, which diagnosed Plaintiff with RSDS of the left hand and noted that she required treatment from an RSDS specialist (R. 205).  Dr. Hartman restricted

her from any use of her left hand, including grasping, from lifting 10 pounds continuously for more than 2 hours or occasionally for more than 6 hours, and from more than occasional bending. She had the physical capacity for several activities, including frequent sitting, standing, walking, climbing, stair climbing, pushing, pulling, grasping with right hand, reaching over the shoulder, and squatting, kneeling, and crawling. Dr. Hartman noted that she should be restricted from marked changes in temperature and humidity and would require handicap adjustments if she drove a car.

On March 8, 2005, R. Digby, M.D., a state agency physician, reviewed the medical evidence of record (R. 189-96). He opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and perform limited pushing and pulling with her upper extremities (R. 190). Plaintiff was limited in her ability to reach, handle, finger and feel, and Dr. Digby opined that she was limited to one-armed, one-handed work using only the right upper extremity (R. 192).

Dr. Israel completed a RSDS/CRPS residual functional capacity questionnaire on August 1, 2006 (R. 219-22). He gave her a poor prognosis with her impairments expected to last at least 12 months (R. 219). He reported that Plaintiff's pain would "constantly (100%)" interfere with her attention and concentration needed to perform even simple work tasks (R. 221). Dr. Israel stated that Plaintiff was restricted to "rarely" lifting less than 10 pounds and never more than 10 pounds. He noted that she had significant limitations with reaching, handling, or fingering. He opined that she would require an unscheduled 30 minute rest break every hour, and noted that Plaintiff would be incapable of even "low stress" jobs (R. 220-22). He reported that Plaintiff would miss more than four days per month as a result of her impairment or treatment.

### e.    Plaintiff's Testimony

Plaintiff testified that before her injury she worked as a grinder and used both hands to put a part into a machine (R. 320-21).  After her injury, she went back to "accommodated work" and lifted 9 pound parts with her right hand until she developed pain in her right arm (R. 321).  She was diagnosed with tendinitis in her right elbow and restricted to a 2-3 pound weight limit with her right arm.  Plaintiff was terminated on January 3, 2005, due to poor attendance (R. 307).  She received a worker's compensation settlement of $47,500 in May 2005.  She stated that her impairments are tendinitis in her right elbow and RSDS/CRPS in her left hand with constant pain that radiated to both arms (R. 304-05).  Plaintiff claimed that her pain was temporarily controlled by Lorcet, but she became lightheaded and drowsy due to medication (R.  309, 320).  Plaintiff rated her pain as an 8 or a 9 on a scale up to 10, and she reported that she has difficulty sleeping due to the pain (R. 310-17).  She stated that her daughter helps her with household chores, including laundry, preparing meals and grocery shopping (R. 315-16, 318).  Plaintiff was able to pay her bills without assistance (R. 317).  She stated that she was capable of standing and sitting for a couple of hours and walking about a mile (R. 319).

Plaintiff has a valid driver's license with no restrictions on driving and drives right-handed (R. 303).  She drives 3-4 times per week, but not for very long, noting that her right elbow bothered her " every now and then" when driving.  She goes over to her mother's house to visit every day for several hours while her daughter is in school (R. 317).

### 2.    *Vocational Expert's Testimony*

Vocational Expert Melody Henry ("VE") was first asked to classify Plaintiff's past relevant work (R. 324).  The grinding machine operator position was considered light and unskilled.  The assembler position was sedentary and unskilled.  The job Plaintiff performed

after the accident would be considered a favored work position and would not exist in competitive employment.

ALJ Matulewicz asked VE Henry a hypothetical question that assumed the claimant could:

- carry or lift 20 pounds maximum occasionally, and 10 pounds frequently;
- stand up at least six hours and sit at least six hours in an eight hour day;
- only occasionally climb ramps, stairs, stoop, kneel, crouch, crawl or balance;
- never climb a ladder or rope or scaffolds;

and should

- only occasionally bend, twist or turn at the waist or neck;
- avoid concentrated exposure to extreme cold or heat, wetness, humidity, noise, or vibration;
- only occasionally push or pull with the left upper extremity;

with

- no handling, fingering, feeling with the left hand;
- no use of the left hand work
- no use and never use any air power, torque or pneumatic tools;
- no forceful gripping or pinching with the left extremity;

and work that would not involve

- concentration on detail precision tests, or multiple or simultaneous tasks;
- producing a specific number of pieces per hour; and
- does not have a down line or up line dependent coworker.

(R. 325)

Assuming these restrictions, VE Henry stated that the claimant would not be able to perform her past relevant work as she performed it or as it is performed in the national economy. While Plaintiff would be unable to return to any of her previous work, VE Henry believed that there was other work in the regional economy that she could perform (R. 325-26). She testified

that Plaintiff could perform light and unskilled work in the State of Michigan, including a hostess position (4,300), a greeter position (1,310), a child care monitor position (6,015), and a security guard position (9,500) (R. 326).

The VE also said that if the ALJ found Plaintiff's testimony fully credited relative to her pain, discomfort, and limitations, then Plaintiff would neither be able to return to her previous work nor would she be able to perform any other work available in significant numbers in the regional or national economy (R. 327). Plaintiff testified that her pain was at a level of an 8 or a 9 when her medication begins to wear off. According to the VE Henry, this would make it difficult for her to complete even simple unskilled tasks on a regular basis (R. 327-28). In addition, the side effects claimed by Plaintiff from her medication of lightheadness and drowsiness would also make it difficult for her to complete simple, unskilled tasks, and the ability to maintain concentration, persistence, and pace sufficient to do one and two step tasks on a regular routine.

### 3.    *The Administrative Law Judge's Decision*

ALJ Matulewicz found that Plaintiff met the disability requirements for insured status through the date of this decision, and she has not engaged in substantial, successful, gainful activity since April 22, 2004, the alleged onset date (R. 18).

Plaintiff's impairments found to be "severe" under 20 C.F.R. 404.1520(c) and 416.920(c) include: complex regional pain syndrome, left hand; reflex sympathetic dystrophy, lefthand; tendonitis, right elbow; and depression.

ALJ Matulewicz found that Plaintiff's allegations regarding her limitations were not totally credible, and that she retained the RFC to perform light work with no use of her left hand[3] (R. 23). He determined that Plaintiff could not perform her past relevant work and has no transferable skills, but there were a significant number of jobs in the regional and national economy that Plaintiff could perform including hostess, greeter, child care monitor and security guard (R. 26).

## II.   ANALYSIS

In her motion for summary judgment, Plaintiff argued that (1) the ALJ failed to fully consider all of the effects of her severe impairments; (2) the ALJ failed to follow Social Security Ruling 03-02p when he disregarded the debilitating effects of her RSDS/CRPS upon her ability to perform competitive full time employment; (3) the ALJ failed to correctly apply Social Security Ruling 96-7p; and (4) the ALJ failed to accord appropriate weight to the treating doctors opinions of limitations (Dkt. #8).

### A.   __Standard of Review__

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is

---

[3]ALJ Matulewicz found that Plaintiff had the residual functional capacity to lift a maximum of 20 pounds and lift 10 pounds frequently. She may sit, stand, or walk for at least 6 hours of an 8-hour shift. She should never use a ladder, scaffolds or ropes. Plaintiff is restricted to only occasional use of ramps or stairs, stooping, crouching, kneeling, crawling, and balancing. She should avoid all concentrated exposure to extreme heat or extreme cold. Plaintiff should never use pneumatic, torque or power tools. She is restricted from any handling, feeling, or fingering with her left upper extremity. Plaintiff should avoid concentrated exposure to hazards, including dangerous/unprotected machinery or work at unprotected heights. She is restricted from any work that requires the use of her left hand, including pushing and pulling with the left hand. She is limited to only occasional bending, twisting, or turning at the waist or neck. Plaintiff is restricted from jobs that involve concentration on detailed/precise tasks or multiple/simultaneous tasks. She is limited to jobs without production quotas mandating a specific number of pieces per hour or with a down line co-worker who is dependent on the claimant's productivity.

supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

### B.  Factual Analysis

#### 1.  *Plaintiff's claim of RSDS/CRPS*

Plaintiff argues that "[t]he ALJ did not credit RSDS/CRPS with the debilitating effects it can have and does have in [Plaintiff's] case" (Dkt. #8, p. 12).  Plaintiff acknowledges that the ALJ did find the RSDS/CRPS to be a severe impairment, but claims that the ALJ inappropriately "discounted Plaintiff's recital of limitations" (*id.*, p. 13).  ALJ Matulewicz  considered that while Plaintiff had symptoms of RSDS, they were not of a disabling severity, and they seemed to respond to conservative treatment.  Since RSDS/CRPS is not a listed impairment, Plaintiff must show more than a diagnosis to establish disability.  SSR 03-02p.  ALJ Matulewicz  noted Plaintiff's reports that her right elbow pain was 50% better after taking Motrin and that her range of motion and pain in her left elbow improved with Vicodin (R. 22).  He also considered that Plaintiff was not fully compliant with physical therapy and did not follow up on Dr. Hartman's referrals to an RSDS specialist or his referral back to Dr. Lazoff for further pain control (R. 21-22).  The medical literature on RSDS/CRPS has demonstrated that an early diagnosis and physical therapy results in a better prognosis.  SSR 03-02p.  Plaintiff's failure to comply with

these recommendations could reasonably be interpreted as an indication that Plaintiff was not experiencing pain as extreme as she claimed. Finally, in considering the severity of Plaintiff's RSDS, ALJ Matulewicz considered Dr. Lazoff's opinion that Plaintiff's RSDS was mild in nature and also considered Dr. Sampson's opinion that Plaintiff's pain was not of disabling severity (R. 127, 173).

The only contrary opinion in the record is that of Dr. Israel, and the ALJ provided grounds for minimizing this analysis. There is no evidence that Plaintiff's condition worsened by March 2005 or August 2006 to justify Dr. Israel's dramatic change in opinion from his October 2004 "To whom it may concern" letter that only restricted Plaintiff from any use of her left arm because repetitive use could aggravate her RSDS (R. 121). *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994) ("the ALJ did not err in declining to refer to [the treating physician's] opinion because [the treating physician] originally opined that claimant could perform sedentary work and did not provide any objective medical evidence to support his change of heart."). Plaintiff points to no specific evidence to support a significant decline in her condition after October 2004.

Plaintiff argues that Dr. Israel's later opinion of disability is supported by Dr. Digby's opinion that Plaintiff's statements were "mostly credible" (Dkt. #8, p. 11, R. 194). While Dr. Digby found Plaintiff's complaints mostly credible, he also did not fully credit her complaints.. His residual functional capacity assessment has exertional limitations similar to those found by the ALJ (R. 189-96). Dr. Digby's evaluation does not support the extensive limitations found by Dr. Israel. Rather, Dr. Digby supports the ALJ's finding that Plaintiff could perform a limited range of light work despite her impairments. (R. 190-92).

Plaintiff argues that the ALJ failed to consider the recognition in SSR 03-02p that RSDS

15

may worsen over time (Dkt. #8, p. 11). Yet, that ruling also recognizes that RSDS is not necessarily a chronically disabling condition, as Plaintiff suggests, but rather presents differently in each patient. "The signs and symptoms of RSDS/CRPS may remain stable over time, improve, or worsen." SSR 03-02p. In this case, the ALJ had substantial evidence to show that Plaintiff was not disabled by her RSDS/CRPS.

### 2. *Credibility*

Plaintiff contends that the ALJ improperly applied Social Security Ruling 96-7p in assessing her credibility as it pertains to her allegations of pain and limitations. Subjective evidence is only considered to "the extent . . . [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. 404.1529(a). The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Comm'r of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

In determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In *Jones*, 336 F.3d at 476, the Court noted that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.

In light of the contradictory medical evidence, ALJ Matulewicz did not find Plaintiff's

allegations regarding her pain and limitations to be fully credible.  Review of a credibility determination requires the court "to accord the ALJ's determinations of credibility great weight and deference particularly because the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying.  Therefore, analysis is limited to evaluating whether or not the ALJ 's explanations for partially discrediting [a claimant] are reasonable and supported by substantial evidence in the record." *Jones*,  336 F.3d at 476 (citation omitted).

Plaintiff claims that the ALJ failed to appreciate the nature of RSDS/CRPS, mischaracterized her ability to perform daily activities, and did not consider side effects caused by Plaintiff's medication in assessing her credibility (Dkt. #8, pp. 12-15).  ALJ Matulewicz discussed all of the medical evidence of record pertaining to Plaintiff's RSDS diagnosis and specifically found that it was a severe impairment that caused significant work-related limitations (R. 18).  ALJ Matulewicz , however, declined to credit fully Plaintiff's allegations of constant, disabling pain because they were not supported by the record and were countered by some of the other evidence.

ALJ Matulewicz  considered that "the record suggests that the claimant was seeing physicians primarily for her worker's compensation claim, rather than in a genuine attempt to obtain relief from the allegedly disabling symptoms" (R. 24).  In particular, prior to her workers compensation claim settling she was examined by several physicians, but afterwards Dr. Israel rendered all treatment which amounted simply to prescribing pain medication without any effort to find a cure for the underlying ailment (R. 172).  Dr. Sampson even expressed a concern that Plaintiff's going from physician to physician was resulting in her lacking "a clear definition of who" was in charge of her care (R. 172).

The ALJ noted that some of Plaintiff's doctors believed that Plaintiff's RSDS/CRPS was

improving or at least controlled (R. 133, 210). He also found that Plaintiff damaged her credibility when she became upset over Dr. Lazoff's opinion that she had a mild form of CRPS and was improving (R. 127).

ALJ Matulewicz determined that Plaintiff was not credible concerning her alleged limitations in her daily life activities based largely on her own testimony of her actual daily activities (R. 23). Plaintiff was able to perform many daily activities, including driving 3-4 times per week without restriction, caring for her 10 year-old daughter, visiting her mother daily, reviewing her daughter's homework, paying bills and performing other household activities with assistance (R. 303, 315-318). Her ability to perform these activities suggested to the ALJ that she was not as limited as she had alleged. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [Plaintiff's] ability to conduct daily life activities in the face of his claim of disabling pain.").

The ALJ also reasonably found that these activities were inconsistent with Plaintiff's allegations that she had a disabling level of drowsiness and lightheadedness as side effects from her medications and that her pain was a constant 8 or 9 on a scale up to 10 (R. 310, 320). There was little evidence that Plaintiff complained to her doctors about the side effect of her medication. There were entries of some medications that she stopped taking because of the side effects but nothing concerning side effects of the medication she continued to take (R. 127, 132). The ALJ had substantial evidence that her limitations caused by her RSDS/CRPS and the side effects from her medication were not as severe as she claimed.

### 3. *Opinion of Treating Physician Dr. Israel*

Plaintiff argues that ALJ Matulewicz erred in assigning little weight to Dr. Israel's residual functional capacity questionnaire. It is well established that the findings and opinions of

treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.[4] The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

The ALJ, however, gave good reasons for assigning little weight to Dr. Israel's opinion and those reasons are supported by the record. ALJ Matulewicz found that Dr. Israel's opinion was not inconsistent with other evidence of record. (R. 25). The ALJ relied on the opinion of Plaintiff's other treating physician, Dr. Hartman, because his opinion was consistent with other evidence of record and supported by the medical evidence. *See* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994) ("The Secretary, however, is not bound by treating physicians' opinions, especially when there is substantial medical evidence to the contrary. Such opinions are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence.").

ALJ Matulewicz considered that Dr. Israel's opinion "contrast[ed] sharply" not only with the opinion of Dr. Hartman but also with that of Dr. Digby, the state agency physician. Both of these doctors completed capacity assessments noting that Plaintiff could perform essentially

---

[4]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

one-handed light work on a continuous basis (R. 189-92, 205). ALJ Matulewicz also considered Dr. Lazoff's opinion that Plaintiff's RSDS was only mild and was improving (R. 133). Dr. Israel's opinion was also at odds with the opinion of Dr. Sampson, who found that Plaintiff's RSDS pain was not of a disabling severity (R. 173).

The ALJ also considered that Dr. Israel's claim of severe impairment was at odds with Plaintiff's treatment history which included non-compliance with physical therapy and prescribed medications (R. 25). And while Dr. Israel opined that Plaintiff required such extreme limitations as an unscheduled 30 minutes rest break every hour, Plaintiff's own account of her daily activities fails to support this (*compare* R. 220, *with* R. 315-16, 318). Plaintiff testified that she needed assistance with some of her daily tasks, she did not state that she required rest periods of such frequency. Additionally, despite her poor compliance with physical therapy, Plaintiff's therapist noted that she was independent in her activities of daily living (R. 24, 152).

Ultimately, the decision of disability rests with the ALJ, not the treating physician, especially one whose opinion is countered by the other physicians and evidence on record. ALJ Matulewicz 's residual capacity assessment was consistent with Dr. Hartman and Dr. Digby's assessments and he had substantial evidence to support his determination that Dr. Israel's residual capacity assessment questionnaire should be accorded little weight.

### 4.    *Plaintiff's Depression*

Plaintiff also alleged disability due to depression (R. 22).[5] Other than a prescription for Effexor issued by her primary care physician, the ALJ noted that the record reflects no actual treatment for this alleged impairment. In February 2004, prior to the alleged onset date, Plaintiff

---

[5]Plaintiff did not list depression as the cause of her disability in her Disability Report - Appeal (R. 68); her Disability Report (R. 94-100); her Application for Disability Insurance Benefits (R. 53-62); or her testimony (R. 298-332).

reported to Dr. Israel that her mood was better and she was thinking more clearly. She noted that she was "not jumping on her daughter as much" and was not crying. In December 2004, after the alleged onset date, Plaintiff was still taking Effexor and reported that her mind was clear and calm (R. 217). Dr. Israel continued to prescribe Effexor with continued reports of a clear mind (R. 212-16). On November 21, 2005, Dr. Israel noted that Plaintiff's affect was good and she reported that she was more clear-headed (R. 212). The doctor continued to prescribe Effexor in 2006, but there are no other comments on Plaintiff's symptoms of depression in his treatment notes (R. 207, 209, 224-26). Without some evidence that the depression is restricting Plaintiff in some significant way, the ALJ properly concluded that Plaintiff's depression while severe did warrant a finding of disability.

## III.   RECOMMENDATION

For the reasons stated above, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


DATED: September 19, 2008                    s/ Steven D. Pepe
                                             STEVEN D. PEPE
                                             United States Magistrate Judge


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **_Report and Recommendation_** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 19, 2008.


                                             s/ Vee Sims
                                             Case Manager to Magistrate
                                             Judge Steven D. Pepe
                                             (734) 741-2298